The International Brotherhood of Teamsters is a non-profit, non-governmental, non-governmental organization of the United States.  It is a non-profit organization that provides services to the people of the United States.  The International Brotherhood of Teamsters is a non-profit, non-governmental, non-governmental organization of the United States. It is a non-profit organization that provides services to the people of the United States. The International Brotherhood of Teamsters is a non-profit, non-governmental, non-governmental, non-governmental organization of the United States.  The International Brotherhood of Teamsters is a non-profit, non-governmental,  non-profit organization that is committed to providing a global,  The International Brotherhood of Teamsters is a non-profit, non-governmental, non-governmental, non-governmental non-profit organization that is committed to providing a global, non-governmental non-governmental non-profit organization that is committed to providing a global,  inclusive, For as available only, the FERC has created a rebuttable presumption in the regulations. If they do think that that is a reasonable calculation of avoided costs, why wouldn't it apply to the other context as well? Because an as available price is generator agnostic in the sense that the generator has no commitment to deliver Because an as available price is generator agnostic in the sense that the generator has no commitment to deliver Ops a day ahead to in fact do it. So from that standpoint, it doesn't matter if they're electrons or from a gas plant, a solar plant, or a wind plant. But for a contract, long-term contract, like here for solar, the tiered pricing structure that the defendants raise is what they're really doing. That, like all things, is generator-specific avoided costs. And specifically for tiered pricing, what the QF, such as the plaintiff's QFs, replace are similar ones that the utilities would buy. And as we argued, and we did argue below too, LMP is basically a natural gas price in ICE on New England. We argued that at page 20 of our policy. And the district court said that even if you wanted to avoid locational marginal price, you could use the standard formula which doesn't incorporate the locational marginal price. And so why isn't that an answer if there's an alternative way to calculate the contract price? Okay, so the district court did say that, all right plaintiffs, we agree that we're not going to go with the locational marginal price because it's a rebuttal presumption. Right, even if. But the standard rate, nobody knows what's in the standard rate. The district court didn't know what's in the standard rate. The standard rate does refer to rule 4.109, which refers to ICE New England. And we included this in our opposition. Your adversary does say standard rates are not based on LMP, right? Well, yeah, they are. I mean, and that's in the declaration which the district court said it considered. And that is, where is that? I forget. Oh, it's at pages 40, paragraphs 41 to 44 of the little declaration. The only rates that ICE New England knows are locational marginal price. That's it. Whether it's stay ahead or real time. So you're saying just the reference to ICE New England, which is the organization that calculates the locational marginal price means that that must be part of the standard offer calculation. Not the standard offer, the rule 4.1. Right, the standard rate. Standard rate, that's what I meant. Right, but in any case, just before we move further into the arguments, why isn't there a question of preclusion? So didn't you litigate all of these issues before the Vermont Supreme Court? Like this question went to the Vermont Supreme Court as to whether Rule 4.100 complied with the FERC rules and whether Vermont was entitled to offer a non-FERPA compliant program as long as it had a FERPA compliant program. And the Vermont Supreme Court decided those questions. So haven't you already litigated these questions in the state court? Yeah, I don't think the Vermont Supreme Court decided those questions, Your Honor. I don't think they've had jurisdiction to decide those questions, even if they did. So it did, but it was in the context of an appeal of the denial of your permit, and they said, well, the Vermont laws say that the Vermont Public Utility Commission used to comply with federal law, and so therefore we have to decide whether their rules are compliant with federal law. I mean, it goes through all of the state courts. I don't recall the opinion reading that. Justice Robinson, who's a judge of this court now, wrote that. And I don't think that she, well, what she said was not that we are ruling on the issue of whether these are permitted by FERC and FERPA. But assuming they are, we find, you know, whatever they address to be in accordance with Vermont law. Consider in turn the two questions raised by the parties' positions. Whether Rule 4.100 complies with the pricing and other minimum requirements of FERPA, Vermont may apply a market-based pricing mechanism in its standard offer program, and whether Rule 4.100 complies with the pricing and other minimum requirements of FERPA. And then it goes on to decide that, those questions, which are exactly the questions that we're considering here. So on the factual issues, standard rate, no one really knows, because this case was decided on a motion to dismiss. There was no fact that that would develop. In the Winding Creek case, the judge held a one-day trial, brought in the experts to find out what the rates actually were, then made the decision. Just, I mean, the Output 1 case is still pending before the district court. I'm right about that. Yes, Your Honor, I think. And your client has moved for summary judgment there. I mean, I'm just trying to understand the state of play. And in that litigation, you made some and are arguing about some of the same arguments that you're arguing today. We are, Your Honor. And the district court has made a consideration of that case pending our consideration, or what's the state of play there? The district court has not issued any ruling to that effect. I think from a practical perspective, I think the judge may be waiting for this court to rule in this case to see whether or not the last case, in fact, rejected the main legal argument that the district court relied on here. So, I guess I'm missing my reply time. Would you like to use it now? No, I'll wait. That's okay. Good afternoon, Your Honors. May it please the court. Ryan Cain on behalf of the members of the Vermont Public Utility Commission. This court should affirm the district court's decision below because Rule 4.100 provides all that FERPA requires. It provides qualified facilities and opportunity to enter into a contract for their avoided costs. And the basic requirements of FERPA are clearly established by Rule 4.100. As a result, under law... Actually, the question I just asked about the solution, I mean, didn't we have the litigation before the Vermont Supreme Court? And did it already decide that when you have a FERPA compliant program, you could have a non-FERPA compliant program that also decided that Rule 4.100 complied with FERPA based on exactly the arguments that are being presented here about the contract term and the use of locational marginal price and other things like that? Yeah, I didn't brief this case, Your Honor, and so I don't know why that wasn't included. But to the extent whether this court does it based on preclusion, based on the Vermont Supreme Court's decision that you just quoted from, whether it's based on FERPA's own longstanding interpretation that so long as the state has a FERPA compliant program, that a tiered approach and alternatives available to qualified facilities are not preempted or do not conflict with FERPA, or the Ninth Circuit's decision in Pine Creek, which explicitly recognized that as well, and it says on page three of that decision, acknowledged FERPA has long held that so long as the state... How acknowledged is it that FERPA's position doesn't necessarily say whether it's right or wrong, correct? That's true. I think this court still owes deference to FERPA's interpretation of its own regulations. But again, I think it's just... I don't think this court needs to rely heavily on deference in this case because I think the basic structure of FERPA and FERPA's regulations provide ample opportunity for states to regulate and implement in this space. And why is that? It's because the FERPA regulations say that the FERPA requirements are kind of a minimum requirement and that the utility and the qualified facilities can enter into other kinds of contracts. Exactly, Your Honor, yes. And even, you know, mandatory, like, must-buy contracts, like if the regulator requires the utility to purchase power. So long as the state offers a program that meets the basic minimum requirements of FERPA, yes. The congressional framework established in FERPA, as I say, is pretty simple and it's pretty straightforward. It requires utilities to purchase from these small qualified facilities. It ensures that they don't get the short end of the stick when doing so and they're able to buy it for their avoided costs, the minimum that they would have to pay otherwise to either generate it themselves or buy it from other provisions. And then Congress left the rest of that to FERC to implement through its rules, determining what avoided costs means, incremental costs as it's used in... I think I understand your argument, but does that language in the statute, either FERPA or the Power Act, expressly would tell us whether the tiered approach is permissible, right? Correct. There's nothing that says that either way. And that's why I think it's important that what Congress did say was we're going to leave it to FERC to implement. And also in section F of... subsection F of section 210 of FERPA, it specifically acknowledges that the state utility regulators will get to implement the FERC rules. So Congress said FERC, you adopt rules establishing what avoided costs mean and all that. I guess the way my thought is that the Federal Power Act says the commission can regulate the interstate commerce for the sale of electric energy, but it says the commission doesn't have jurisdiction over facilities used in local distribution, right, which is like the public utility that's based in the state. So the baseline is they get to regulate a lot, you know, pursuant to state rules. Then FERPA comes along and says you have to accept electricity offered for sale by qualifying facilities. But it doesn't preclude other kinds of arrangements. And if the default rule is that the state can pervasively regulate a public utility, then there's no reason to think that there would be a prohibition on other kinds of programs that are required, right? Absolutely. And then the FERC regulations themselves say that you can have other kinds of contracts entered into by the utility and qualifying facilities. Absolutely, Your Honor. That's absolutely correct. And I think that's... And I guess, I mean, I guess there is this question. I mean, we're talking about the statute and the regulation. I mean, technically the posture of this case is the cause of action that Congress provided under FERPA for a party to enforce against the state regulator compliance with the FERC rules, right? Yes, compliance with the bare statutes. That's not within the scope of this case. You'd have to then sue FERC or something. Absolutely. But the question here is, does the Vermont program comply with the FERC regulations? Right. Has Vermont violated... Absolutely. Has Vermont violated FERPA, like in Wining Creek, by not providing those basic minimum obligations that FERPA requires of states? To be precise, it's not what FERPA requires directly. FERPA authorizes FERP to promulgate rules, setting rates, and the cause of action is to enforce compliance with those rules. Correct. So what about what we just heard from Mr. Malone, that we don't really know how the standard district court really should have an evidentiary hearing to figure that out? What's your response to that question? I think the district court correctly determined that as a matter of law, the plain language of Rule 4.104E2 refers directly to the FERC regulations in establishing avoided costs for utilities for energy, and there's no reference anywhere to location of marginal price, and the counsel for the appellant, either in the briefing or here today, hasn't articulated exactly how they believe with specificity that isn't a valid avoided cost rate determined at the time of obligation for energy. I think to the extent Mr. Little in his affidavit suggested otherwise, I think that's just belied by the plain language of Vermont's rule, and I think that's what the provision you're talking about, E2, does refer, say index rate shall be tabulated using on peak and on peak once before the rate for the ISO and the rules of Massachusetts hub. Sorry, I misspoke then. I meant E1. E2 is the index rate, which does include L&P, and that's an optional rate, which again, your question, Judge Menasci, about why it would include delivery rates, why it wouldn't be an avoided cost for time of obligation rates, and counsel articulated that somehow time of delivery rates consider the source specific, but time of obligation rates don't, but that's incorrect. That's contrary to the plain language of Section 210 of FERPA, which requires that the rate paid by the utility is the utility's avoided cost that they would be able to purchase that power for from any other source or generated themselves. So that baseline of avoided cost is set by the statute, and that's what FERPA requires, and that's what the FERPA rules require. There's nothing in a time of obligation. So actually avoided cost is what they would have had to pay if they were getting it from a facility that was generating a different type of energy. Completely irrelevant what type of energy they were getting it from, whether they generated it themselves, as it's articulated in the statute, or on the open market, and so the fact that ISO New England's LMP relates to 51% natural gas is irrelevant because avoided cost... Because you need an estimate of what they would have to pay for energy in general. That's what avoided cost means. It's looking at what you would have to pay if you didn't get it from this qualifying facility, what would you have to pay for it, either generating yourself or on the open market, and that is entirely agnostic to the type of qualifying facility that's seeking a contract or seeking time of delivery. Well, what about the idea that if they're prohibited from entering into a contract for gas-generated electricity, then that's not really an avoided cost because that wouldn't be an alternative to purchasing it from a qualifying facility. That goes to, again, there's ample opportunity for states to regulate utilities in all sorts of ways through renewable portfolio standards, through regulations of the types of energy that each utility buys, and ISO New England covers all the New England states, and each state within New England is going to have different types of those. None of that necessarily is required to be a time of delivery or time of obligation contracts, and that goes toward the ancillary services argument, which I think is sort of part and parcel with that. That's an entirely separate market. Utilities are free to contract with generators of any type for other ancillary services, but all FERC requires is the opportunity for qualifying facilities to sell their energy and their capacity to utilities at their avoided cost, and I don't think there's any question that Rule 4.100 complies with that. Can I ask about the cap on the term of the contract? So it's true that the FERC regulations talk about the right to enter into contracts for a specified term, but it doesn't explain who sets the term. It's interesting the way to understand it and the way FERC understands it is that the regulator gets to set the term. Are there any limitations on that? Like, could you decide that you're only going to enter into contracts for a six-month period? There's nothing in the FERC rules at all that sets the term. The distinction that's made in the FERC rules is between a time of delivery contract and a time of obligation contract, and so that contemplates that an obligation is a meaningful, legally enforceable obligation that reflects a different rate from a time of delivery rate. So a six-month period in the energy market, effectively, if you're redoing it every six months, that's a time of delivery rate, and so I think there comes a point at which those two become conflated, and the FERC rules would be violated as a result of effectively not providing for a time of obligation rate. So that would be a limitation on, like, there would be a minimum period. So, like, maybe it's too short to amount to a specified term, you're saying. Correct. I think that would be the limiting factor on a state regulator's ability to determine the length of that obligation. I mean, there is the general principle, you know, in the rules, that you're supposed to be encouraging sources of alternative energy. So if you set a term that was just not feasible to attract investment and development of the industry, that might be an objection, too, right? And then maybe you'd have a valid argument for, you know, conflict preemption, that it would frustrate the purpose of the act by, you know, effectively getting around it. So your position is that the seven-year terms don't do that? Correct, and I don't think... I mean, is that a dispute? No, it's not. I mean, fundamentally, whether it is or is not, the legal question before this court is whether states have any authority whatsoever to impose terms on obligations or whether it's entirely up to the qualifying facility to unilaterally decide. You know, they say 25 years makes sense because that's the, you know, expected life of the solar panels. But there's absolutely nothing under their view that would limit a qualifying facility to say, I want to enter into a... I'm going to hope for the best and my panels are going to last 50 years, so I want an obligation now establishing the rate for 50 years. Yeah, I understand. So, like, let's say I disagree that they just get to decide any length of a term. Then you should... But then I agree with you that the limitation is on, you know, what promotes investment in the industry and development of the industry, and they are saying that seven years is too short to do that. So why is that not a valid objection? I don't think they've said that seven years is too short to do that. I don't think they've pledged sufficient facts. They've said that there's no... their argument is a legal one, that states have no authority under FERPA whatsoever to determine a time of obligation. If this court rejects that argument, then you should affirm the decision of the trial court in that regard because... and leave for another day if they want to try to challenge in a different way that. But I still think seven years is... Leave for another day. I mean, we have the litigation in Vermont, then we have ALCO 1, and now we have ALCO 2. Like, I don't know if you agree with that. I agree with you there, Your Honor. So I think seven years is... You can determine as a matter of law that a seven-year contract is a legally enforceable obligation. It's set based on, you know, long-term forecasted rates. I'm not an energy expert by any means, but the Public Utility Commission is, and they establish the seven-year rate based on a specific consideration of forecasted rates within ISO New England. And so I just don't think there's any question that seven years is a time of obligation contract where you're having a legally enforceable obligation for a specified term, which complies with the FERC regulations and therefore is lawful. I think my time is up. Thank you very much. We'll hear from Robert. Thank you, Your Honors. Vermont knows the length of term that's required to build the facility. In Vermont, it's 25 years. That's why they have their term for solar, 25 years. We say this in our briefing, the amount of facilities built under the Vermont Rule 4.100 is zero. And if that doesn't prove the point that no one can finance a project based on a seven-year term, I don't know what it does. And what is the reason for that? So if, in fact, there is a must-take provision, so if they offer a contract for seven years, if you know that if you keep offering energy at an avoided cost, the facility will be obligated to purchase this for another term of seven years and another term of seven years forever, why isn't that enough to promote investments? Well, one, Your Honor, I think at this moment in time, there's no guarantee that FERC will still be in existence seven years from now, right, with all the repeal of tax credits and everything else. Second, a bank needs longer-term stream that's fixed. Now, in some jurisdictions, it's not 25 years. It can be five years less, 20 years in Connecticut and Massachusetts. It's a function of the rate as well. The shorter the term, the higher the rate needs to be. It's basic project finance. So that is a factual question, too. I mean, the district court cut off all the factual discussion. What facts do you rely on in the complaint to make it plausible that seven years is an inadequate term? Well, in Complaint Paragraph 19, that's where we say that the standard offer program is the only program that provides a sufficient forecasted rate to meet the obligation under PERPA. And to me, that is a short way to say everything. That's the only one that complies. Nothing else complies. Well, let me make something a bit complex. I mean, your argument is also that the standard offer program does not comply with PERPA. So what do you say it complies with? Oh, we're saying it's the only place where Vermont offers a forecasted rate. That's enough to promote investment banks? Right, that's enough to promote investment. And the statute itself refers to avoided costs being what the utility avoids from buying from that specific facility. And it's a solar facility. And Green Mountain Power. You're saying that the avoided cost should be – I mean, the whole idea of avoided cost is you're buying from an alternative energy source, and you're doing it at the same rate that you would have to pay if you were buying from another source. So how can it be that the avoided cost is based on the facility from which you're actually making the purchase? Well, the statute says such facility. And FERC in Order H-72A, Paragraph 72, discusses that when you do this tier pricing, that when you look at what it displaces, you know, if you're going to create a separate category, like Vermont is saying they're doing it for solar and that's why it's permitted, then another solar facility will displace what Green Mountain Power has to buy in the future. In this case, Green Mountain Power can't buy from gas plants. Right? They can't even enter into a seven-year contract with a gas plant. Your Honor, I'd mentioned the Power Act, and states require or retain jurisdiction for facilities used in local distribution, which is correct, but they don't retain jurisdiction over wholesale sales. Facilities used in local distribution are the interconnection arrangements to the distribution system and the permitting for wherever it is in the state. That's what they retain jurisdiction for. But they don't retain jurisdiction, well, they never had jurisdiction over wholesale sales, which are interstate sales. I mean, I went back to the statement of when the FERC promulgated the final rule that included that provision about other contracts and so on. And FERC said in 1980, the Commission has become aware that several states have enacted legislation requiring electric utilities in that state to purchase the electrical output of facilities which may be qualifying facilities under the Commission's rules at rates which may differ from the rate required under the Commission's rules implementing Section 210 of FERPA. This Commission has set the rate for purchases to the level which it believes appropriate to encourage cogeneration and small power production as required by Section 210 of FERPA. While the rules prescribed under Section 210 of FERPA are subject to the statutory parameters, the states are free, under their own authority, to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies. And that said, if a state program were to provide electric utilities, it must purchase power from certain types of facilities, among which are included qualifying facilities at a rate higher than that provided by these rules. A qualifying facility might seek to obtain the benefits of that state's program. In such a case, however, the higher rates would be based on the state's authority to establish such rates and not on the Commission's rules. So the FERC itself thinks that these other alternative programs exist based on the state's authority to regulate the public utilities and it's not displaced by FERPA or by the Federal Power Act. Do you think that FERPA's just wrong about that and it's been wrong since 1980? I think it was in 19... No, it may have been 1985. FERC recanted. I think the case was Southern California, Edison maybe. I mean, I can provide the citation. FERC said what we said in Order 69 when we issued the regulations that there was this authority to provide rates higher than avoided cost was wrong because the statute itself and then the Supreme Court in Mississippi said that, well, like the statute says, avoided cost is the upper limit and FERC said it at avoided cost, which was permissible under the statute. So then what do you think is the meaning of the regulation, which is on the book, that says nothing in these rules prevents a utility and a qualified facility from entering into contracts at other rates or on other terms? The meaning of that is just that by enacting FERPA, Congress wasn't saying, well, a utility and a generator can no longer enter into a voluntary agreement like they always have without state involvement, without the state saying you have to... What do you mean without state involvement? I mean, most of these are public facilities, right? They are creatures of the state that are permissibly regulated. Right. So the state commission can say to a public utility you have to buy X amount of your energy from a renewable generator, which a lot of states do, but they can't specifically regulate a wholesale sale. That is still... What do you think of that? So that would be preempted by the FTA. Right. And you think that's what we have here. The wholesale sale is a separate thing. And even the FERC ruling in 2010, California Public Utility Commission, we cite in the briefing, I can't remember which note, but FERC... So that program was set up the same way when you think of this regulation that the district court relied on. What the CPC argued was that, well, really this is just an offer by QF, voluntary offer. And FERC rejected that because it's not a voluntary offer. I mean, it's a must take obligation. Vermont has determined what the avoided costs are from our facilities. And we don't dispute that. That position is that if you have a FERPA compliance program, you can have non-FERPA compliance programs, right? Well, I disagree with that. Is your position that that's not actually a FERPA position or that FERPA is wrong about that? Yeah. Well, I think one... Sorry, I don't know what the question is. Yeah. One, I think, was wrong about that in the 2013, 2015 rulings that they issued, which did not discuss any precedent or anything else. They just said, you know, there's nothing that prohibits generators from voluntarily going to utilities and entering... Okay. So if that is, you know, FERP's interpretation of this regulation, we'll reject it if it contradicts the language of the regulation. What in the regulation contradicts that position? Well, I don't think the regulation says what the district court says it does because it doesn't say anything about giving the state the ability to regulate other wholesale sales. And FERPA doesn't give the state the ability to regulate wholesale sales except if they comply with FERPA. I mean, your argument is basically FERPA is an exception to a prohibition, and unless the program is compliant with that exception, there's no authority for the state to have an alternative program. Just as a statutory matter, you're really relying on the Federal Power Act and the fact that FERPA is an exception to what otherwise falls within the agency's interstate authority. Correct, and they can have alternative programs, but they're still, you have to realize, even in the alternative programs, you're still regulating wholesale sales and compelling wholesale sales. So... Wait, so I thought your position is they can't have alternative programs unless those programs comply with FERPA. Right, so... So they can't have alternative programs. They must only have FERPA-compliant programs. Right, they must only have programs that somehow comply with FERPA because in all these programs, they're regulating wholesale sales of electricity, and at least from a legal perspective, our position is that the Federal Power Act prohibits that because it's a wholesale, so... Judge Geronimo, did you have anything further? You're on mute. I have a very simple question to take you back. You filed this action while the first appeal was pending, is that right? Correct, that's right, Your Honor. And can you refresh my recollection as to why you did not bring the claims that you assert here, why you didn't assert them in that action? Yeah, I mean, that's a good question. The first action we filed was in 2020. The defendants denied the certificate of public good for the Chelsea Solar Project in 2020. That appeal, since we were convinced that it couldn't be affirmed because no state ever goes past the point of interconnection in determining what's a combined facility. So by the time that appeal was decided, I think it finally was decided in 2023, but the other action was filed in 2020, the first action. So we had hoped that it wouldn't be an issue which we would have to come to the district court with, and we didn't know that that was going to be the case until 2023, but the first case we had filed in 2020. So we weren't trying to raise in 2020 issues that we had hoped may never have to be raised. Thank you. Thank you, Your Honors. We will take the matter under advisement. Thank you both. The next case is Italian-American v. Queens v. City of New Haven. Good afternoon, everyone. My name is Norm Pettis. I represent the Italian-American Defense League and Mr. Mark Morelli. The issue in this case is quite simple, and that is whether standing was adequately played. Can I just ask if you could raise the podium a little bit? Yes. I'm having a little difficulty hearing you. I'll scootch down. I apologize. That's good. The issues in this case revolve around the question of standing, whether it was adequately played, and if not, whether the district court erred in dismissing with prejudice. We say there was standing, and we rely in part on some very evocative language from Summers v. Earth Island Institute where they talked about the need for harm in fact. In Summers v. Earth Island, there was a sort of, and it says if the harm in fact affects recreational or even aesthetic interests of the public, that will suffice. And in this instance, we pled, or what was pled, was that a person's interest in his home and in his neighborhood wasn't played. Right. So if it's in first standing, if I want to go visit the wildlife in some place abroad and interference with the wildlife is an injury that's in first standing, it's got to be the case that if you alter the environment in which I live, if I have allegations that I decided to live there because of the environment, it's got to be that there could be an aesthetic injury. Right? That's your point. Yeah. Does it matter that Mr. Borgarelli has moved to Florida if the relief you're seeking is the restoration of a statue in New Haven? Yes, it does. Why did he leave the neighborhood? If he left the neighborhood in part because of this alteration and sold his home at a discount rate because he figures it would be- So he'd come back if they restored the statue? No, but he might seek damages for the loss of the value of his home and the loss of satisfaction he had in living there. The contention is, and you know, this is not a mere evanescence- Are you seeking damages in addition to the injunctive relief? Well, as to Mayor Elicker, yes. As to what? As to Mayor Elicker, the second defendant in this instance, because what happened- Why are you standing for each? I'm sorry? You're standing for each claim for relief, right? It's just about the injunctive relief. If he doesn't live there anymore, he probably can't seek an injunction to restore a statue. No, but if he's similarly situated to the IADL members- Right, you're saying there are at least some members of your organization who do live there. That's correct. They care about the character of the neighborhood. That's correct, and it's not a transient interest. You know, I'm tempted to be glib and say beauty is in the eye of the beholder, but that would sell short all the institutions in the audience and that branch of philosophy. But these are historic interests that have been recognized in New Haven for a long time. That statue was a gift incident to the lynching of Italian-Americans in New Orleans 125 years ago. The city accepted it. It's recognized and regulated by the historic commission. So I get that point, and maybe my colleagues will have more questions about stand-ins, but the district court thinks that even if you did have stand-ins, you just wouldn't have a claim on the merits because you don't have a property interest in the statue. So what about that? So maybe there's some aesthetic injury for a stand-in, but why isn't it the case that, you know, the statue belongs to the city of New Haven and they manage city property, and so you just don't have a property interest where you can say that your constitutional rights were violated through the city's management of its own property. Paradoxically, that's where, which was much to my surprise, the Connecticut Environmental Protection Act saves us because in that instance, lower court holdings have held that asserting an interest in a historic property, which this is, gives a party standing. And what New Haven did in this instance was ignored that standing, and the reason we sued Ellicott is he lied to everybody. He said there was a vote. There is an interest that was violated because it was abridged without any notice or opportunity to be heard. I get that you have the allegations of the violation of the municipal procedures, but you have to also show that there is a liberty or property interest protected by the Constitution. Well, we think that's adequately pledged, and we think there is. If you don't have a value in your home and its surroundings, what do you have a value in? It's a person's principal investment. It's pretty conclusory as to the effect on the plaintiff's home. It is. I think it has an effect on the value of separate damage to his property interest. It is, and we didn't think that we had to fact-plead. We thought the notice-pleading was appropriate. I think at pages 17, 18 thereabouts in our brief, we talked about things that we could have done with an amendment. I'm talking about why it's a violation of your property rights to remove a statue that belongs to the city, and you're now talking about property values. Municipal governments do all sorts of things that are stupid and affect property values, but you don't get damages when a municipal government makes a city less livable than it was before. No, but when it moots an historic district, it's the manner in which it did here, and you're in that neighborhood, and you've chosen to live in that neighborhood and acquire property because of the neighborhood's character, as Italian is luminously. What you're describing now is a standing argument, I think, to explain why you're injured, but I'm asking about why there's a violation of property rights protected by the due process clause. Because a home's value isn't taken in isolation. It's more than the bricks and mortar and land on which it sits. It's the environment for the setting. So whenever a municipal government makes a public policy decision that reduces the property value of a resident's home, and it does so in violation of some kind of municipal rule, you can get damages and I think it's free from the municipal government. I don't think I need to defend that proposition to win this appeal. I think we've got the historic district and its responsibility for managing this and the commitment expressed to property owners in the neighborhood that this district would be treated a certain way, and the city ignored it. So this isn't a question of altering the time. Do you have a contract, you say? Do you have a contract with the city of New Haven to manage the neighborhood in a certain way? Well, that's a bad metaphor to use in discussing government. Do we have a contract with it at all? But it strikes me that when the city makes a commitment and people act in reliance on that, it's a contract substitute. Did these people rely to their detriment on a commitment the city apparently made only to change it when political winds changed? That's the contention here, and so we think there is a property interest there. You've reserved three minutes. We'll hear from your adversary. Mayor, police court. I'm Earl Givagniello. I represent the defendant appellees, city of New Haven, and Mayor Justin Elicker. The district court properly held that plaintiffs did not have standing. There was no direct injury to the Italian-American Defense League. In fact, I think it's shown in the district court's decision that the group was not even formed until after the statute had been removed. And there's nothing that removal of the statute affected it, had any impact on its core activities. So they're relying on what is referred to as a representational standing. And that comes down to the same injury that Mr. Maccarelli would have had by just having a property that's near the statute. Well, it's not just having a property, right? So, like, you know, if we take for granted what Mr. Pattis pointed out, that the Supreme Court recognizes the injuries, right? So, like, Justice Scalia tells us in Lujan that if I have a plan to go look at wildlife in Egypt and then some kind of government activity interferes with the wildlife in Egypt, I have standing to sue over the government's environmental policies in Egypt. Like, if that's true, how can it possibly be that if in my backyard they change the aesthetics of the neighborhood and I have allegations that I live there because of the character of the neighborhood and it's something I see every day, that that's not an injury? Yeah, the problem is that a universal benefit is not a property interest. Right, but this is a universal benefit, right? Because it would be acknowledged that if somebody who lives in Oklahoma City just reads in the paper that the city of New Haven ruined the statute and they're offended by it, they wouldn't get to sue because they don't live there, they don't enjoy the environment, they don't have any plans to go there with which it's interfered. But, like, the allegations here are these are people who bought property in this particular neighborhood because of the character of the neighborhood, and when the character of the neighborhood changes, they suffer an aesthetic injury. That's not a general injury. That depends on the particular people and the reasons for living in that neighborhood, right? It's just like a distinction between people who are worried about the wildlife in Egypt and the people who have a plan to go visit the wildlife in Egypt, right? Well, I don't think that's a distinction that would matter. I think the fact is... Has Mr. Schubert told us that that does matter? I don't know. I'm not familiar with that case, Your Honor, but I do know that... It's a standing case. I mean, Lujan is a pretty obvious precedent. But I think the case law is pretty specific that if there's a universal benefit, in this case they're saying everyone in that neighborhood is affected by it. But they're not saying everyone in that neighborhood, right? Because not everybody who lives in the city of New Haven is a member of the Italian-American Defense League, right? It is people who live in New Haven because they care about the character of the neighborhood and want to preserve it in a certain way. Obviously, there are people in New Haven who don't have those interests because, at a minimum, the people on the city council who want to remove the statue don't care. So that's not universal to everybody in New Haven, right? No. In fact, the members of the Italian-American Defense League live all over. Most of them are in other places in Connecticut. I think there are only like five that are in New Haven. Okay. But actually, doesn't that show that it's not universal? So let's say we're only talking about the five people, right? So there are five people in the city of New Haven who say, I moved here because I care about the character of the neighborhood, the quality of it being a little Italy, and the city's preservation of that environment. And when the city removed the statue of Christopher Columbus as a symbol of that neighborhood character, it affected the quality, the character of the neighborhood. I suffered an aesthetic injury, just like people who want to see animals in Egypt. And it's particular to five individuals. So how can you say we're talking about a universal benefit if you have to identify five specific people in order to explain the injury? But they're saying it's an aesthetic benefit for everyone who sees this statue in the park. I don't think that's what they're saying, right? Because not everybody moves to New Haven for this reason or cares about that character of the neighborhood, right? I'm not sure anyone does. And that's what makes it so speculative, that the removal of the statue somehow affects the character of the neighborhood so much that they have a right to sue. Okay, so that's a different issue as to whether anybody actually cares. But let's say, just for purposes of my question, assume there is somebody who moves to this neighborhood because they like the character of the neighborhood, and they want to live there because they want to live in a little Italy-type neighborhood. And the removal of Italian hero Christopher Columbus from the park that's across the street from their home alters the character of the neighborhood. Isn't that harm to that person? I suppose you could allege that, Your Honor. Your argument is that that's not alleged in this complaint. It is not. There is, Paragraph 11 of the complaint does allege some aspects of that. But to the extent that it is alleged like that, I just don't think it's a liberty interest or a property interest. Oh, I get that. That's a merits question that I was asking Mr. Paddock about. So before we get to that, I'd like to also ask about, even if you think it's not adequately alleged, to acknowledge that it's at least possible that such a person would have standing, doesn't it mean that they should at least have the opportunity to provide those allegations to the extent that you think they haven't done it yet? Yes, Your Honor. But I think then you have to look at the due process argument, the merits, which the court did. And I think you can't say that there is a property interest or liberty interest that has been affected by this. Also, I do want to address briefly the argument that there is a Connecticut Environmental Protection Act possibility. That was not presented to the district court. It wasn't even suggested. It wasn't asked, and it's a state law claim. So in order for the district court to retain supplemental jurisdiction, it's within their discretion. I think it's highly unlikely that if there were no federal claim, that the district court would retain jurisdiction. I think the argument is not that it's a federal, that it's a state law claim under the act. I think Mr. Pattis was suggesting that because the state gives you a right to sue over environmental changes, it means that you have a property interest conferred by the state and the environment, right? I think it's an interest from that state court. Your position would be that just because Connecticut allows you to sue over that doesn't mean you have a property interest in the environment in Connecticut. Exactly. Can I ask you some basic questions about moving beyond the injury in fact question? The New Haven residents were not notified at any point that the Board of Park Commissioners would be discussing the possible removal of the statute from Worcester Square Park at the public meeting held on June 17, 2020. Is that right? Well, that's the allegation, but I don't think if we get into the fact that would be the case. The historic commission meets regularly and their agenda is posted on the website and the public is invited to go to any of its meetings. And it was discussed at the meeting and there was an approval. So I'm not sure that would matter. But even if that were the case, I think there was a case from this court that indicated that that would not be enough for due process violation. Let's see if I can have that case. I think it's the BAM historic district case. If you look at that, that doesn't arise. The one about the homeless shelter. Yes. Right. And so there we said that you don't have a property interest in the character of the neighborhood. You might have standing if they alter the character of your neighborhood, but you don't have a property interest in not having a homeless shelter located near your house because that's a public policy judgment about management of public property. Yes. And basically I don't think this is a legal issue. This is a political issue. If there were a different mayor, a different board of alders, a different historic commission, they could bring the statue back. It's in a museum right now. There's nothing permanent about what's been done. And I'd also like to point out to the court that one of the reasons it was moved was because the city didn't want to pay 24-hour police to guard the statue, which was a point of contention. And in other communities, the statue had been removed, put in a river, graffiti put on it, and it seemed like a sensible thing to do while there was such controversy about it. It's not disputed that there was no formal vote on the question of whether to remove the statue, right? The statue. I listened to the tapes. They seem to be asking everyone, and I don't think there was any dissent among the historic commission when they discussed the issue. Whether there was a formal vote, I'm not sure. Were there ever minutes taken reflecting how the board reached this decision? There are minutes of that meeting, yes. Where does that have to be found? Is it in the records somewhere? I believe the minutes are posted on the website, and I'm sure they were part of the discovery. All right. Thank you. We'll hear from everyone. The Lujan hypothetical, you know, listening to it discussed in court, makes me wince. I mean, animals in Egypt, you know, but it's the case. And as is the language in Summers versus Earth. Does it make you wince? Yeah. It's hard for me to imagine somebody calling me up and saying, I was going to go to Egypt and see the last standing unicorn or whatever, and some public act passed by somebody on a toot in Oregon makes it impossible for me to do that. Would you bring a 1983 claim? I'd have to read Lujan long enough. It might be an APA claim or a challenge or something, but like you were saying before, it's well established that there is an aesthetic injury as long as you have a particular interest in the aesthetics of the particular place, which might be that you intend to go observe the animals. What I'm confounded by is how can you have an injury? If it's a cognizable interest, is it a liberty interest or a property interest? Well, you know, is it a different question? Isn't it a different question when the interest you're asserting is your property and the character of the neighborhood and the associational rights that go with it? I think that this case should have advanced to discovery. We could have answered some of Judge Cabranes' questions. I'm not aware that there are minutes. We obviously didn't make these allegations up. I'm not aware that there was an agenda with public notice. What I'm aware of through my clients is the mayor standing up and saying, this happened, and people saying, what, when, where? And when they look for answers, not getting any. And so it was as though somebody came into their neighborhood and took a beloved edifice. Okay, and I guess your position would be, it's a motion to submit that you allege that there wasn't an edifice, and a boat. So we're going to take that for granted. I think I'm entitled to that at this point. Right. But then what's your response to Mr. Gia Vanello's argument about the banned historic district case where we say, you don't have a property interest in not having a homeless shelter in your best public property, and the city gets to decide where it's located. You don't get to decide the character of your neighborhood in that way. The difference is the assignment to the historic district of maintenance of the park, and the statute's role as part of the park. This wasn't a public policy decision to extend. So, sorry, you're saying that the designation of the park as a historic district confers a property interest protected by the constitution on the residents of the neighborhood? In part, yes. Why is that? Because you move to a neighborhood because of what it gives you. Not just the home, but the environment the home is in. And if there are settled expectations, everything about the law is about settled expectations. How do strangers live together without violence? We have settled expectations in the civil and in the criminal world. So if I live in a quaint neighborhood for 40 years, and then all of a sudden the city puts a homeless shelter in my neighborhood, can I sue for a violation of the constitution? You're out of luck there unless there's an historic district that cloaked symbols and indicia of that neighborhood as there was in New Haven. That's why there were votes on changing the character of the park. That's what the requirement was. It was a commitment of the city to its residents to behave in a certain way. And when it didn't, the neighborhood changed. And there was no opportunity to be heard. And the neighborhood is their home. Thank you. Thank you, Patrick, and we will take the matter under advisement. The next case is Goodman v. Local 804. The appellant won't be presenting argument today. And we thank you both for coming in. You're free to go ahead with arguments or to submit. Up to you. Thank you, Your Honor. I'll give a brief argument. I know we were limited to two minutes. I'm Jason Hilliard on behalf of UPS. I think Mr. Goodman was, the appellant was, a day late here. February 17th was the day the panel met. He was there. There was a union advocating, union representative advocating for him at that panel hearing. He was told afterward that the panel had decided against him. So we know that the lawsuit was filed six months and one day after that. So outside of statute of limitations. But his claim depends on how the panel rendered that decision, right? Because he thinks the key piece of information is how the union members voted. And he did not learn that until later. That's true. That's what he alleges. And we're going by the essence of his complaint. But he would have known the same day that he had a suspicion that the union breached its duty. And although he tries to say that he didn't find that out until later in his third amendment complaint, you look to his sworn affidavit, he says in paragraph 14, even though the union called and told me that the arbitrator voted against me, I did not believe the union. So he knew then, allegedly, that the union didn't fairly represent him. But what the judge decided, and I think decided properly, is that regardless of whether he was late, he failed to state a claim. Because if you look at the claim and to what you said, Judge, what he complains about is not that the union failed, but how they voted, right? He wants to know how they voted. But that is what the contract says. It provides for the grievance procedure and it says in the contract. Right, the union members don't have a duty to vote for a union member, right? But he does allege that there's like a conspiracy between the union members and the company, right? He alleges that there's this conspiracy. The conspiracy being that he doesn't like the way the CBA set up the collective bargaining room because it allows a jury of his peers, really, two union members, to decide his fate before it goes to the arbitrator. But that's the way the CBA is written. So his conspiracy is the CBA. Well, doesn't he also allege that he was lied to about how the matter was resolved? And what the judge says correctly, I think, in the district court's ruling is that it doesn't matter if they inadvertently slipped and said, hey, the arbitrator decided against you. But if it was part of a conspiracy to treat him unfairly. Right, but there's no evidence of any type of conspiracy. There's just his allegation that he was told incorrectly, which whether or not they said that the panel decided against you or the arbitrator decided against you, the CBA was fault. Well, he alleges that they lied to him on purpose, but I guess your position would be he has to show bad faith and it's not clear from the allegations that it was badly intentioned or whatever, even if we take for granted the idea that they told him the arbitrator is the one who voted. That's right. I have nothing further. Thank you. Good afternoon, Your Honors. May it please the court. I'm H. Joseph Cronin, attorney for the union. I feel kind of awkward agreeing with the management attorney on this, but fundamentally it's a pretty clear-cut matter. The complaint was properly dismissed because it was procedurally, procedurally fatally flawed as well as Procedurally flawed because of the deadline. Precisely, Your Honor. Well, so what about this? So your position is the fact as to how the arbitrator voted doesn't really matter, because there was no obligation, or how the union members voted, because there's no obligation on the part of the union members to vote for the, you know, the ones on the panel to vote for those that have to be a union member, right? Correct. But he thinks it's relevant, and that's the basis of his claim, so if there's a fact that he thinks is important that he doesn't learn about later, is that when the claim occurs, or should we decide what facts actually do matter and say he should have brought the claim earlier? Well, it's pretty well established. I'm sorry, I'm supposed to be speaking into this. It's pretty well established that the clock starts running when the injury occurs, correct? So it's one of the So it's when you learn about it, right? Well, from when you learn or when you could have learned. So, I mean, I guess there's a couple different routes. So a few things. One, he initially swears in an affidavit that he learned that day about it, right? That he learned that he had lost. So, like, just for the purposes of my question, let's say he didn't learn until later how the union members voted, and he thinks that is relevant for standing in court. Well, then he's wrong on the law, so it doesn't really matter what he thinks, right? So because he was there, he saw what happened at the arbitration. He knew about what was in the CBA that lays out how the arbitration is going to take place, what the methods are. So he's on notice of what happened. So that's where the clock starts running from. And I'd also point to there were a couple exhibits in his primary brief. I believe there were exhibits C and E. I believe E was the one where it's basically a receipt from the arbitration saying that the panel decided to uphold a termination, and he refused to sign it. So he was there, right? He interacted with them, right, on the day. Did they tell him to vote at that point, or did they just tell him that the panel decided against it? Well, that's how it said that the underside further agreed that a majority decision of the joint committee in the above dispute will be the final and conclusive. Right, but wouldn't it have been good to learn from that receipt that, you know, whether the administrator, or the chair of the arbitrator had to break a deadlock or whether the other members voted against it? There's four signatures, and there's two UPS and two union members on the panel. So, ergo, at least one person. So when the chair votes, does he also sign this? So the arbitrator only votes when there's a deadlock.  So would you be able to tell from the receipt whether he voted or not because he does or does not sign it? Yeah, because there's two from each side, and here there's four signatures.  But hey, man, inspection limitations is not jurisdictional, so I guess you would say regardless of how that plays out, he'd be able to take the claim. Yeah, so there's the tremendous latitude and deference that's given to unions in these sorts of situations, and this being a hybrid LMRA 301 DFR claim. So similar to the, I guess it's not in the case law, but I kind of was thinking, it's kind of similar to the sort of deference that arbitrators often get, right, that given the specifics of labor management relationships, the unions sometimes have to make tough decisions. This was not a tough decision here. So yeah, there's nothing to indicate that he did, that the union did anything wrong. Even if the union was negligent, which if wasn't, is not a thing that we were, that would still not rise to the level of arbitrary bad faith or discrimination. He asserts a discrimination claim, but he never identifies what his protected class ostensibly was. So, yeah. Thank you. Thank you both for coming in, and we will take the matter under advisement. That concludes the argumentative report this afternoon, so I'm going to ask the deputy to adjourn court. Court is adjourned. Thank you.